**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANYELLE KEMPER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12 CV 2367 DDN |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Danyelle Kemper for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. The undersigned has plenary authority over this action by consent of all the parties, under 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Danyelle Kemper, born on August 20, 1986, filed an application for supplemental security income under Title XVI on January 18, 2007. (Tr. 82-88.) She alleged an onset date of disability of August 20, 1986, due to learning disability, illiteracy, and inability to count money. (Tr. 98.) Plaintiff's application was denied initially on May 3, 2007, and she requested a hearing before an ALJ. (Tr. 46-50, 53.)

On November 24, 2008, following a hearing, the ALJ found plaintiff not disabled. (Tr. 13-21). On October 23, 2009, the Appeals Council denied plaintiff's request for review, and she appealed to the district court. (Tr. 324-26.) On September 20, 2010, the district court reversed the Commissioner's decision and remanded the case for further proceedings. (Tr. 304-06.)

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

On November 17, 2011, following a second hearing before a different ALJ, the ALJ again found plaintiff not disabled. (Tr. 262-79.) Plaintiff appealed, arguing that the ALJ had not complied with the district court order, October 24, 2012, the Appeals Council found that the ALJ had complied. (Tr. 249-59.) Thus, the second decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On June 6, 1997, plaintiff's father took her for a neurological evaluation by James R. Rohrbaugh, M.D., to determine if plaintiff suffered from attention deficit disorder (ADD). Plaintiff was eleven years old. Dr. Rohrbaugh's impressions were that plaintiff suffered from static encephalopathy,[2] possibly related to prenatal drug exposure, manifest by: 1) borderline microcephaly;[3] 2) learning disabilities reported by plaintiff's father, 3) borderline or mildly handicapped intelligence; 4) short stature; and 5) "inattentive behaviors." Dr. Rohrbaugh suggested Ritalin for use during the upcoming school year.[4] Her father reported that her teachers found her slow since kindergarten, testing indicated that she had a learning disability, and she had been in special education. He also reported that her teachers felt that she suffered from ADD, as indicated by her daydreaming, occasional fighting, and inattentiveness. (Tr. 206-209.)

On August 20, 1997, her 11th birthday, plaintiff completed the Wechsler Intelligence Scale for Children-III. Martin Rosso, Ph. D. administered and evaluated the test. Plaintiff received a verbal IQ score of 58, performance IQ score of 52, and a full scale IQ of 51.[5] In sum, plaintiff demonstrated below average verbal abilities, a weakness in visual-spatial abilities, and below average nonverbal reasoning. She also demonstrated a weakness in attention and mental

---

[2] Encephalopathy is any disorder of the brain. Stedman's Medical Dictionary, 636 (28th ed., Lippincott Williams and Wilkins 2006) ("Stedman").

[3] Microcephaly is abnormal smallness of the head. Stedman at 1205.

[4] Ritalin, or methylphenidate, is used to treat attention deficit disorder. WebMD, http://www.webmd.com/drugs.

[5] According to this report, a full scale IQ of 51 indicates means that the individual scored equal to or better than less than .1% of her age group on this exam. (Tr. 162.)

focus. Her scores placed her within the mentally deficient range of intellectual functioning. (Tr. 160-64.)

On August 27, 1997, Debra J. Becker of Harvest Middle School submitted an Educational Evaluation of plaintiff. Ms. Becker reported that, compared to others at her age level, plaintiff's performed in the low average range in broad knowledge, which includes science, social studies, and the humanities, and in the very low range in broad reading, broad mathematics, and broad written language. She fared significantly better in broad knowledge than in the other areas. Ms. Becker found that age-level tasks for plaintiff involving broad written language would be extremely difficult to impossible and age-level tasks involving broad reading and broad mathematics would be impossible. (Tr. 157-59.)

On September 8, 1997, Debra J. Becker submitted the results of the American Association of Mental Retardation-Adaptive Behavior Scale evaluation. Jan Steele, plaintiff's teacher, and Mr. Williams, plaintiff's father, completed the evaluation form, which rates plaintiff in three areas. First, regarding the personal self-sufficiency factor, which relates to basic daily living activities, plaintiff received ratings of very superior and superior. Next, regarding the community self-sufficiency factor, which rates a person's ability to function in society, plaintiff received a rating of average by both raters. Additionally, regarding the personal social responsibility factor, which rates skills that will likely guarantee full or at least partial normalization into society, plaintiff received ratings of above average and average. (Tr. 165, 168.)

On September 19, 1997, plaintiff visited Dr. Rohrbaugh for a reevaluation. Dr. Rohrbaugh's impression was static encephalopathy manifested by borderline microcephaly, learning disabilities, and ADD. Dr. Rohrbaugh reported plaintiff responded well to psychostimulant therapy due to substantial improvement in academics, calmer demeanor, participation with her family, and ability to independently perform chores. Dr. Rohrbaugh recommended that plaintiff continue taking methylphenidate principally on schooldays. He requested a follow-up appointment with plaintiff in six months. (Tr. 238.)

On October 7, 1997, Ms. Steele submitted an Educational Staffing Summary regarding plaintiff. She reported plaintiff's enrollment in a mild/moderate mentally disabled program and speech and language therapy services and her use of Ritalin. Ms. Steele found plaintiff's functioning in the moderately mentally handicapped range, that she was speech disordered in the

area of articulation, and that such findings were not primarily attributable to vision, hearing, or motor impairments, social disadvantages, or emotional disturbance. (Tr. 185-89.)

On May 12, 1998, plaintiff visited Dr. Rohrbaugh for a reevaluation. Dr. Rohrbaugh's impressions were that plaintiff continued to suffer from static encephalopathy. Dr. Rohrbaugh reported plaintiff responded well to Ritalin, and seemed more inattentive and inactive without it. Dr. Rohrbaugh recommended that plaintiff continue methylphenidate on schooldays with occasional use on weekend days for special events. He requested a follow-up appointment in six to seven months. (Tr. 237.)

On June 9, 1999, plaintiff visited Dr. Rohrbaugh for consultation. Dr. Rohrbaugh's impression was minimal cerebral dysfunction manifested by ADD. He recommended that plaintiff continue methylphenidate principally on schooldays and occasionally before organized activities. Dr. Rohrbaugh recommended that plaintiff's stepmother occasionally cease plaintiff's medication once during the school year or occasionally use a day's worth of medication on a weekend day. Dr. Rohrbaugh recommended plaintiff return for a follow-up appointment in eight to nine months. (Tr. 236.)

On February 28, 2000, plaintiff visited Dr. Rohrbaugh for a follow-up appointment. His impression was minimal cerebral dysfunction manifested by ADD. Dr. Rohrbaugh observed that plaintiff continued to respond well to her medication. However, teachers reported some minor changes, such as plaintiff getting out of her chair and wandering around the classroom. Dr. Rohrbaugh recommended plaintiff continue methylphenidate, and he asked that plaintiff return during the fall. (Tr. 235.)

On November 14, 2000, plaintiff visited Dr. Rohrbaugh for a follow-up consultation. Dr. Rohrbaugh's impression was static encephalopathy manifested by borderline microcephaly, learning disabilities, and ADD. He also noted her short stature and observed her lack of growth since her last visit. Dr. Rohrbaugh recommended that plaintiff continue methylphenidate and advised the family to inquire with another physician about whether other studies regarding plaintiff's condition were warranted. (Tr. 234.)

On March 1, 2002, plaintiff visited Dr. Rohrbaugh for a follow-up appointment. Dr. Rohrbaugh's impression was encephalopathy. He also observed plaintiff's short stature and lack of growth since her last visit. Dr. Rohrbaugh recommended that plaintiff see an endocrinologist

and receive blood tests, including a comprehensive metabolic screen. He additionally advised that plaintiff have a wrist x-ray to determine bone age. He indicated that although she was in the eighth grade, plaintiff could perform only second or third grade work and observed her struggle to read a paragraph intended for second-graders. Dr. Rohrbaugh suggested plaintiff's family discontinue methylphenidate on a trial basis for one week's time at school to observe any changes in her performance. He also discussed using a time released methylphenidate preparation, such as Metadate CD. (Tr. 232-33.)

On March 7, 2002, plaintiff's Present Level of Educational Performance Report (PLEP) indicated that plaintiff participated in modified, small group instruction in math, language arts, social studies, and science classes. She could write personal information and fill out checks using a model. Plaintiff had made progress with time and money, including telling time to the minute, counting mixed change to $1.00, and independently making purchases in the community. On school achievement tests, plaintiff's scores fell in the following percentiles: 11% in total reading, 21% in reading comprehension, 10% in problem solving, and between one and three percent in listening, thinking, and battery skills. (Tr. 151-52.)

On March 31, 2003, plaintiff visited Dr. Rohrbaugh for reevaluation. Dr. Rohrbaugh's impressions were that plaintiff suffered from static encephalopathy and maintained a short stature without discernible growth. Her father reported school difficulties, including skipping or arriving late to class and detentions. However, he indicated that the medication substantially improved plaintiff's condition, allowing to her to focus, concentrate, and be calm. Dr. Rohrbaugh advised plaintiff to seek care from a regular pediatrician, get blood tests and a wrist x-ray recommended during her last visit, and increase her dose of methylphenidate principally on school days. He requested a follow-up appointment in nine to ten months. (Tr. 245-46.)

On September 9, 2005, Case Manager Juli Smith submitted an Individual Education Program report (IEP) regarding plaintiff. She attended a job seeking and work experience class where she performed jobs in the classroom and throughout the building, including placing mail into staff mailboxes and delivering balloons for a student run business. She used copiers and keyboards to create flyers and small documents, although she required assistance with spelling. When she enjoyed her job and had proper support, she performed excellently. Plaintiff lost her paid position with Chartwells due to missing ten or more days of work, including days of in-

school suspension.  Her diagnosis of mental retardation impacted her ability to fully participate in a general education setting, and she benefitted from small class size, small group instruction and some one-on-one instruction.  Her parents remained concerned about her motivation to graduate and ability to take responsibility for her own actions.  Ms. Smith found plaintiff's diagnosis of mental retardation appropriate.  Plaintiff's interests included working at a friend's cleaning company or retail, job training or community college, and living on her own.  She shopped for some groceries and worked during the summers in the STEP program.  Her IEP goals included the areas of reading comprehension, math skills and life management skills.  Plaintiff progressed significantly toward these goals but was dropped from school due to poor attendance.  (Tr. 137-47.)

On September 11, 2006, Case Manager, Juli Smith, submitted an annual IEP report from Francis Howell High School regarding plaintiff.  Plaintiff was 20 years old and in the twelfth grade and diagnosed with mental retardation.   She attended work experience and math classes, maintained the delivery schedule, and learned the accounting aspect of a student run business.  She also used office machinery including the shredder, copier, and simple word processor.  Plaintiff left school in spring of 2006 but reenrolled the following August.   However, she continued to struggle with attendance.  (Tr. 123-33.)

On May 3, 2007, J. Spence, PhD., submitted a Psychiatric Review Technique form regarding plaintiff.  He found that plaintiff suffered the medically determinable impairment of mild mental retardation.  He further found mild limitations in her ability to maintain social functioning, and moderate limitations in her ability to perform activities of daily living and maintaining concentration, persistence or pace.  He indicated that she could perform one or two step tasks on a sustained basis.  (Tr. 216-26.)

Dr. Spence also submitted a Mental Residual Functional Capacity Assessment regarding plaintiff.  He found moderate limitations with the ability to understand, remember, and perform detailed instructions, the ability to complete a normal workday and workweek at a consistent pace, the ability to travel to unfamiliar places or use public transportation, and the ability to set realistic goals and plan independently.  (Tr. 213-15.)

On March 13, 2007, Lauretta V. Walker, PhD., evaluated plaintiff.  Dr. Walker described plaintiff as a twenty year old woman that appeared approximately twelve years old.  According to

her driver's license, she measured four feet, eleven inches and 90 pounds, although her boyfriend indicated that she measured four feet, six inches and 86 pounds.

Dr. Walker conducted the Wechsler Adult Intelligence Scale III and opined that plaintiff appeared to try on the test and that the results were valid. Dr. Walker reported a verbal IQ of 62 "(1st percentile, between 56-68 at the 95% confidence interval)", a performance IQ of 65 "(1st percentile, between 60-74 at the 95% confidence interval)", and a full scale IQ of 61 "(.5th percentile, between 58-66 at the 95% confidence interval)". The scores fell within the mild mentally retarded range, which Dr. Walker found accurately portrayed plaintiff's functioning. (Tr. 210.) Plaintiff's subtest scores were low, except for picture arrangement where her score neared average. Dr. Walker found that she had some understanding of social situations but found her judgment markedly immature. She diagnosed mild mental retardation and a GAF score of 69.[6] She found plaintiff not capable of handling her own funds and that she could not add, subtract or handle money. (Tr. 210-12.)

On October 18, 2010, plaintiff saw Dr. Barbin and complained of persistent, achy low back pain. Dr. Barbin indicated that plaintiff suffered bipolar II disorder. Plaintiff reported consuming approximately two wine or beer drinks per week and that she last consumed during the prior month. Her medications included ranitidine HCl, Flexeril, alendronate sodium, citalopram, ibuprofen and risperidone.[7] (Tr. 421-24.)

On January 6, 2010, plaintiff visited Laurie Heaps, FNP BC, for a follow-up medical examination. Plaintiff reported that her back felt a little better and that her medicine proved

---

[6] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000) ("DSM").

On the GAF scale, a score from 61 to 70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy), but the individual generally functions well and has some meaningful interpersonal relationships. Id.

[7] Ranitidine HCl is used to treat and prevent stomach and intestine ulcers. WebMD, http://www.webmd.com/drugs. Flexeril is used to treat muscle spasms. (Id.) Alendronate is used to prevent bone loss. (Id.) Citalopram is used to treat depression. (Id.) Risperidone is used to treat certain mental/mood disorders. (Id.)

helpful.  Nurse Heaps diagnosed plaintiff with lumbar arthropathy and prescribed Flexeril.  (Tr. 416.)

On June 22, 2010, plaintiff visited nurse practitioner Laurie Heaps for an additional follow-up appointment.  Plaintiff complained of nausea and vomiting since June 12, 2010.  She further complained that the Promethaxine prescription received during an emergency room visit caused dizziness, insomnia, and leg twitching.[8]  She also requested a new psychiatrist.  Nurse practitioner Heaps prescribed amoxicillin and meclizine.[9]  (Tr. 414.)

On August 9, 2011, Walter Clayton Davis, M.A., L.P.C., conducted a counseling assessment of plaintiff.  She reported use of risperidone and ranitidine.  She further reported that, despite her attempts to obtain employment, she had never been employed due to inability to manage money.  She reported the inability to spell or read.  She began experiencing anxiety and mood swings around others since age 14 or 15.  She saw Dr. Muddansi for her mental condition but stopped receiving psychiatric treatment after she moved in the spring.  She also reported auditory hallucinations, including music and whispers since age 14.  She further reported yelling and throwing objects at others due to sudden anger, becoming easily frustrated, memory and concentration impairment, and sleep difficulties.  He considered bipolar disorder, diagnosed depression, anxiety disorder, and mild mental retardation, and assessed a GAF of 48.[10]  He recommended that plaintiff resume treatment of her mental health symptoms and to see her primary care provider.  (Tr. 369-407.)

Mr. Davis indicated that plaintiff was not a malingerer.  During the examination, he observed symptoms of bipolar syndrome, change in personality, memory impairment, mood disturbance and sleep disturbance.  He noted extreme limitations regarding understanding and memory, extreme limitations regarding sustained concentration and persistence, marked

---

[8] Promethazone is used to treat nausea and vomiting and allergy symptoms and to induce drowsiness or relaxation.  WebMD, http://www.webmd.com/drugs.

[9] Amoxicillin is used to treat bacterial infection.  WebMD, http://www.webmd.com/drugs. Meclizine is used to prevent and treat nausea, vomiting, and dizziness caused by motion sickness. (Id.)

[10] A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job).  DSM at 32-34.

limitations regarding social interaction, and extreme and marked limitations regarding adaption. He also indicated that plaintiff would require two to three breaks per two hour period during a normal workday and that her condition was likely to produce good and bad days. He further indicated that she would miss more than four days per month due to her condition. Mr. Davis opined that plaintiff was not a candidate to seek and maintain employment due to low cognitive functioning and difficulties with mental health symptoms. (Id.)

**First ALJ Hearing**

The ALJ conducted a hearing on October 22, 2008. (Tr. 22-43.) Plaintiff testified to the following. She is 22 years old and lives with her fiancé, Tyrine Kemper, and another friend. She is also close with her older sister who lives in St. Charles. She measures four feet, six inches. Her fiancé cleans the house due to her disability. She does not shop due to inability to drive and would need assistance with reading and money. She can buy postage stamps at the post office and follow conversation. (Tr. 26, 29, 32, 34.)

She completed the twelfth grade and graduated from high school, attending special needs classes throughout her education. During high school, she worked as a pizza cutter at Chartwells. She stopped working at Chartwells ended because she no longer wanted to work. (Tr. 26, 35.)

She cannot read any of the words on a newspaper page. Additionally, she cannot write beyond signing her own name. For example, she is unable to compose a simple grocery list of items. In school, she learned how to use a telephone directory but requires assistance reading the directory's contents. (Tr. 27-29.)

She struggles with counting money. When paying for an item, plaintiff reports she cannot tell if she received correct change from the cashier. She has never had a checking account and cannot write checks or pay for utility bills. (Tr. 27-28, 35.)

Plaintiff cannot drive and has never taken a written test for a driver's license. She knows how to drive, but driving makes her nervous. Her fiancé is able to drive. She knows how to take public transportation, including the bus. However, she may not know which bus to board due to inability to read the destination on the front of the bus. (Tr. 28, 33, 35.)

On most days, plaintiff remains in her home. She typically wakes up at 11:00 a.m. and goes to sleep at midnight. Her sleep routine varies based on television programming. When she

wakes up, she takes a shower and watches television until her fiancé returns home around 5:00 p.m. She may also go outside to look at the leaves or play video games. She prepares meals for herself using a microwave, but she cannot cook. She has no difficulty with personal hygiene. (Tr. 28, 31-32, 34, 36.)

Her fiancé occasionally takes her to a restaurant to eat. Recently, plaintiff and her fiancé went to the airport and flew two-seater airplane. (Tr. 33-34)

Plaintiff's fiancé completes most of the couple's household chores because her disability prevents her from doing so. She vacuums but does not wash dishes or use computers. (Tr. 26, 35-36.)

She has trouble with her memory, although she remembers some things better than others. She cannot wash laundry because she does not know how to operate the washing machine, although her fiancé has shown her how. (Tr. 29-30, 32-33.)

She felt nervous during the ALJ hearing. She often feels nervous when she enters a room with strangers and wants to go to another room. Yet, if she went to the store with someone to assist her, she would feel comfortable in the store. Specifically, she is less nervous around her fiancé. (Tr. 28, 30, 33-34.)

She has gotten angry on more than one occasion. She recently became angry at her attorney's office because she could not attend dinner with her father. She has become angry on other occasions but cannot recall specific examples. (Tr. 29-30.)

Plaintiff's fiancé, Tyron Kemper, also testified at the ALJ hearing. He testified to the following. He is 34 years old and works in lawn care. He met plaintiff through her sister. He has known her for four years and has lived with her for the past two years. Plaintiff weighs 86 pounds and has been the same weight throughout the relationship. (Tr. 36-37, 40-41.)

When plaintiff and her fiancé first met, plaintiff's family "had her under lock and key." Her family prevented her from going anywhere with them and also did not allow her to leave with him. Plaintiff's family did not believe her capable of much. Plaintiff formerly worked cutting pizza but had constant help and supervision. (Tr. 38, 40.)

Plaintiff's fiancé stated that due to plaintiff's disability, he handles most of the couple's household chores, including managing bills, cooking, and grocery shopping. Occasionally, she accompanies him to the grocery store but does not enjoy it and leaves the purchasing decisions

entirely to him.  Plaintiff's fiancé also testified that plaintiff can care for large sums of money.  (Tr. 38-39.)

He has often observed plaintiff's anger and agitation.  For example, she became angry at her attorney's office because the attorney met with another client during her scheduled appointment time.  She becomes loud and stomps around the house when he tries to show her how to complete household chores.  He has also seen the plaintiff become angry with her sister.  (Tr. 37, 39.)

Consistently, when plaintiff is in an unfamiliar place, she stops talking and avoids socializing by secluding herself for the entire duration.  (Tr. 38.)

They leave their home about ten times per month.  Typically, they go to a secluded place in the woods where they build fires and enjoy the peace.  She generally does not want to go inside public locations, including restaurants.  Occasionally, they go through drive-thrus.  (Tr. 39-40.)

When he is away from the home, plaintiff sleeps, watches television, or listens to the stereo.  Before they moved, her sister visited her twice per week but visits less often since the move.  They currently live in the home of a mutual friend and see the friend daily.  (Tr. 41.)

**First Decision of the ALJ**

On November 24, 2008, the ALJ found plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels, but that she could not understand, remember, or perform, complex or detailed instructions; however, she can understand, remember and carry out simple instructions for repetitive tasks, commensurate with unskilled work.  The ALJ found the plaintiff not disabled.  (Tr. 13-21).

Plaintiff appealed the Commissioner's decision to the district court, arguing that substantial evidence did not support the RFC determination.  The Commissioner moved for remand for further consideration of plaintiff's claim and for the ALJ to obtain vocational expert testimony to the determine the impact, if any, plaintiff's impairment would have on her occupational base, which the district court sustained.  (Tr. 304-06.)

**Second ALJ Hearing**

A different ALJ conducted a hearing on October 18, 2011. (Tr. 283-303.) Plaintiff testified to the following. She is 25 years old, measures four feet, six inches tall, and weighs 97 pounds. She graduated from Francis Howell North High School, where she attended some special education classes. She married in October 2010 and currently lives with her husband and a cat. Her husband is employed as a bus driver. She does not have children. (Tr. 285-86, 291.)

After graduating from high school, she worked at the YMCA performing laundry services. The job required her to make decisions that she could not make. The YMCA fired her from this job due to inability to pay attention and follow directions. (Tr. 286-288).

Her daily routine generally involves sitting on the couch and watching television. She does not have a driver's license and relies on her husband to go shopping for their home. She cannot go out alone or count change. Friends sometimes visit her during the day. Her sister also used to visit before moving to Iowa. (Tr. 286-87, 292.)

Her husband sometimes instructs her on household chores, but she does not understand. Her height makes it difficult for her to reach countertops or cabinets. Yet, she can vacuum and launder when her washer and dryer function. She also cleans her cat's litter box. (Tr. 286-87, 291).

She cannot read, write, or perform basic math. She looks at pictures instead of reading. She cannot add or subtract numbers. She can sign her name. Her husband filled out required paperwork in the lobby prior to the hearing. Additionally, she has difficulty paying attention and cannot watch an entire television program. (Tr. 289-90).

People do not like her because she frequently becomes easily frustrated and angry. When she gets angry, she says bad words. (Tr. 288.)

She experiences some pain in her hip and in lower right back near her belt line. The pain makes it difficult for her to sit or stand for more than three hours. (Tr. 290-91.)

She had Medicaid and visited a doctor during that period. She does not know why she no longer has it. Without Medicaid, she cannot see the doctor. (Tr. 292-93.)

Plaintiff's husband, Tyron Kemper, also testified at the hearing. He testified to the following. He met the plaintiff seven years ago when she was 18 years old. He married her three years ago. (Tr. 293.)

He frequently instructs plaintiff on performing household tasks. She can follow the instructions only with assistance. She has some problem with her memory and cannot retain instruction. (Tr. 294.)

Plaintiff performs some chores around the home, such as feeding the cat and cleaning the cat's litter box. However, plaintiff is easily frustrated by himself and other people who ask her to perform tasks. He prefers completing the task himself rather than fighting with her. She does not have problems with friends because he instructs them regarding her disability. Plaintiff dislikes criticism, which she demonstrates by huffing and puffing, screaming, and agitation. Plaintiff's anger is limited to oral exclamations. (Tr. 294-97.)

Plaintiff dislikes changes in her routine. For example, he sometimes encourages her to perform a task. If the task in unfamiliar, she becomes angry, screams, and threatens to move to her family in Iowa. (Tr. 295-96.)

Plaintiff understands the meaning of pennies, dimes, quarters, and dollars but cannot perform calculations. They have no health insurance. She no longer has Medicaid. (Tr. 296.)

Vocational expert (VE) Delores E. Gonzalez also testified at the hearing. The ALJ presented a hypothetical twenty year old individual with high school education and no past relevant work history. The hypothetical individual is not physically restricted from performing work and can understand, remember, and perform simple instructions and non-detailed tasks. The VE responded that such an individual could perform work as a house cleaner, which is light, unskilled work with 887,890 positions nationally and 21,660 positions in Missouri. The VE testified that such a position may involve the use of some chemicals, such a general cleaning materials. She stated that an individual with a fifth-grade reading ability could perform the position. The VE also testified this individual could work as a machine pan greaser, which is also light, unskilled work with 239,550 positions nationally and 5,700 positions in Missouri. The VE stated that plaintiff's height would not affect her ability to perform this position. (Tr. 298-99, 302.)

Plaintiff's counsel presented a hypothetical individual with plaintiff's age, education, work history, and a substantial loss in ability to understand, remember, and carry out simple instructions on a sustained basis. The VE responded that such individual would not be able to work competitively. (Tr. 299-300.)

Plaintiff's counsel presented a second hypothetical individual with substantial loss in ability to make judgments commensurate with the functions of unskilled work, such as simple work-related decisions.  The VE responded that assuming a full or seventy-five percent loss, such individual could perform no work.  (Tr. 300-01.)

Plaintiff's counsel presented a third hypothetical individual with substantial loss in ability to respond appropriately more than half the time to supervision, coworkers, and usual work settings.  The VE responded that this would erode the individual's unskilled base.  If this individual had an inability to deal with changes in a routine work setting more than 50 percent of the time and the person had difficulty making changes in simple, repetitive type work, required changes in the workplace, the individual's occupation base would also be eroded.  (Tr. 301.)

### III. DECISION OF THE ALJ

On November 17, 2011, the ALJ found plaintiff not disabled.  (Tr. 265-79.)  At Step One of the prescribed regulatory decision-making scheme,[11] the ALJ found that plaintiff had not engaged in substantial gainful activity since the application date, January 18, 2007.  At Step Two, the ALJ found plaintiff had the severe impairment of mild mental retardation due to static encephalopathy.  (Tr. 267-70.)

At Step Three, the ALJ found plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments.  (Tr. 271.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with the limitation that she can understand, remember and carry out at least simple instructions and non-detailed tasks.  At Step Four, the ALJ found the plaintiff had no past relevant work.  (Tr. 274-78.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy.  (Tr. 278-79.)

---

[11] See below for explanation.

# IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues that the ALJ erred: (1) by failing to properly consider and weigh the opinions of Dr. Walker, Dr. Spence, and Mr. Davis; and (2) in his consideration of Listing 12.05 addressing mental retardation.

### A.  Opinion Evidence

Plaintiff argues that the ALJ erred by failing to properly consider and weigh the opinions of Dr. Walker, Dr. Spence, and Mr. Davis.

The ALJ should consider each of the following factors in evaluating medical opinions: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) any other factors brought to the ALJ's attention.  20 C.F.R. § 416.927(c).  Further, an ALJ is not obligated to defer to a treating physician's medical opinion unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [is] not inconsistent with the other substantial evidence in the record."  Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008) (quoting Ellis v. Barnhart, 392 F.3d 988, 995 (8th Cir. 2005)).

First, plaintiff argues that the ALJ erred by affording Dr. Spence's opinion great weight. The ALJ found that Dr. Spence's opinion, namely that plaintiff has the ability to perform simple one- or two-step tasks on a sustained basis, was supported by a thorough review of the medical evidence.  The ALJ also found Dr. Spence's opinion consistent with other evidence in the record, particularly plaintiff's education records and psychiatric treatment notes.  (Tr. 274.)  For example, plaintiff's 2006 IEP report states she can use office machinery, including the shredder, copier, and simple word processing.  (Tr. 124.)  Plaintiff also testified she is responsible for some household chores, such as washing laundry using a washing machine and cleaning her cat's litter box.  (Tr. 287, 291.).  Therefore, substantial evidence supports the ALJ's decision to afford Dr. Spence's opinion great weight.

Plaintiff also argues for remand because the ALJ failed to specify the weight given to Dr. Walker's opinion.  Plaintiff is correct that the ALJ's opinion does not specify the weight afforded

to Dr. Walker's opinion. (Tr. 262-79.) Although ALJs must consider opinions in the record, the ALJ is not required to discuss every piece of evidence submitted. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010). "[A]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." Id. The ALJ's references to the IQ scores administered by Dr. Walker indicate that the ALJ considered the short narrative accompanying the scores. Thus, ALJ's failure to specify the weight afforded to Dr. Walker's opinion does not require remand.

Finally, plaintiff argues that the ALJ erred by affording little weight to the opinion of Mr. Davis. (Tr. 274-78). The ALJ noted Mr. Davis, as a licensed professional counselor, is not an acceptable medical source under 20 C.F.R. § 416.913(a). (Tr. 274.) Nevertheless, the ALJ may still consider such a nonmedical source to show the severity of an individual's impairment and ability to function. See 20 CFR § 416.913(d).

In this case, the ALJ lawfully gave Mr. Davis's opinions little weight. Davis did not merely expound on plaintiff's diagnosis of mild mental retardation. He also considered diagnoses of bipolar depression and anxiety disorder. (Tr. 396-99.) These new diagnoses are the only ones of record. The plaintiff herself did not claim to suffer from symptoms related to these conditions before seeing Mr. Davis for treatment. His opinions were internally inconsistent. He also opined that plaintiff has extreme limitations in nearly all aspects of adaption, yet he concluded that plaintiff has at least some ability to function independently outside of her home. (Tr. 404, 405.) Because Mr. Davis's opinions were internally inconsistent with the record, the ALJ was within his discretion to afford his opinions less weight.

Accordingly, plaintiff's argument that the ALJ erred by failing to properly consider and weigh the opinions of Dr. Walker, Dr. Spence, and Mr. Davis is without merit.

## B. Listing 12.05

Plaintiff argues that she meets or functionally equals the criteria of Listings § 12.05B or 12.05C, which deal with mental retardation. "To qualify for disability under a listing, a claimant carries the burden of establishing that his condition meets or equals all specified medical criteria." McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir.2011) (citing Marciniak v. Shalala, 49 F.3d 1350, 1353 (8th Cir.1995)). A claimant will not be deemed to meet a listing merely because she has a diagnosis of a condition named therein and meets just some of the criteria. Id. at 612. An

impairment that manifests only some of those criteria, no matter how severely, does not qualify. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

The regulations define mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" before age 22. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The required level of severity for Listing § 12.05 is met when an impairment satisfies the diagnostic description in the introductory paragraph, as well as any one of the four sets of criteria set forth in paragraphs A, B, C, or D. See 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.00 and 12.05; Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir.2006). It is plaintiff's burden to demonstrate, through medical evidence, that her impairments meet or equal all of the specified medical criteria contained in a particular listing. See Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir.2004).

### 1. 12.05B

The ALJ concluded plaintiff did not meet the requirements of Listing § 12.05B because she had no valid IQ score of 59 or less. (Tr. 271.) The ALJ lawfully discounted plaintiff's 1997 IQ score of 51, because the "regulations explicitly state that IQ test results obtained between ages 7 and 16 should be considered current for only two years when the IQ test result is 40 or above (20 CFR Pt. 404, Subpt. P. App. I, § 112.00(D)(10))." (Id.)

Plaintiff argues that the ALJ erred by finding that she did not meet the requirements of Listing § 12.05B: a valid verbal, performance, or full scale IQ of 59 or less. She argues the ALJ failed to consider her lowest IQ score in light of the five percent margin of error, which would have placed her IQ score within the 12.05B requirement.

The ALJ concluded plaintiff did not meet the requirements of Listing § 12.05B because she had no valid IQ score of 59 or less. (Tr. 271.) Plaintiff cites to Listing § 12.00(D)(6)(c), which requires the ALJ to consider a claimant's lowest IQ score where more than one IQ score is derived from the test administered. Plaintiff argues the ALJ should have considered her 2007 IQ scores in light of the five-point margin of error inherent in the testing protocol. The Wechsler test taken by plaintiff has a measurement error of five points. See Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). For example, a Wechsler IQ score of 70 is considered to

represent an IQ ranging from 65 to 75.  Id.  However, despite the margin of error, plaintiff's IQ scores did not meet the requirements of Listing 12.05B.

Although the Eighth Circuit has not expressly discussed the five-point margin of error, it has "held that where a claimant's IQ score does not fall within the range given in 12.05C, but is slightly above that range, the ALJ's determination that the claimant is not mentally retarded is supported by substantial evidence."  Howard v. Massanari, 255 F.3d 577, 582-83 (8th Cir. 2001); Cockerham v. Sullivan, 895 F.2d 492, 495-96 (8th Cir. 1990); see Selders v. Sullivan, 914 F.2d 614, 619-20 (5th Cir. 1990).  Moreover, several circuit court of appeals and district courts have expressly rejected consideration of the five-point margin of error to determine whether a claimant satisfies listing criteria for mental retardation.  Burns v. Barnhart, 312 F.3d 113, 125 (3d Cir. 2002); Newland v. Apfel, 182 F.3d 918 (6th Cir. 1999); Anderson v. Sullivan, 925 F.2d 220, 223 (7th Cir. 1991); Lawson v. Apfel, 46 F. Supp. 2d 941, 948 (W.D. Mo. 1998); Bendt v. Chater, 940 F. Supp. 1427, 1431 (S.D. Iowa 1996); but see Walker v. Massanari, 149 F. Supp. 2d 843, 847 (S.D. Iowa 2001); Beyerink v. Astrue, 2008 WL 428737 (N.D. Iowa Feb. 14, 2008); Young v. Shalala, 1995 WL 904826 (W.D. Mo. 1995).  Courts decline to consider the margin of error reason for two principle reasons.  First, the plain language of the Listings requires a specific range of IQ scores with no mention of margins of error.  Burns, 213 F.3d at 125.  Second, the margin of error also represents an equal likelihood that the IQ test erroneously awarded a score lower than the claimant's IQ.  Id.  For example, plaintiff's score of 61 indicates that plaintiff's true IQ could be as low as 56 but also as high as 66, a score outside of the parameters of Listing 12.05B. Therefore, the court declines to consider the five-point margin of error to determine whether the ALJ erred by failing to find that plaintiff satisfied Listing 12.05B.

Plaintiff failed to establish presumptive disability under Listing § 12.05B because the record does not indicate a valid IQ score of 59 or lower.  Accordingly, substantial evidence supports the ALJ's determination that plaintiff did not meet the requirements of Listing § 12.05B.

### 2. 12.05C

Plaintiff also argues that she meets the requirements of Listing § 12.05C:  a valid performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  In addition to mild

mental retardation, plaintiff alleges a learning disability, short stature, borderline osteopenia, transitional lumbar vertebrae, lumbago, osteoporosis, bipolar II disorder, and amenorrhea. Though the ALJ found plaintiff's IQ scores met Listing § 12.05C's requirements, substantial evidence supported the conclusion plaintiff had no significant, additional impairment.

Plaintiff argues that the ALJ failed to evaluate evidence of her "learning disability" noted by Dr. Rohrbaugh and Nurse Heaps as an additional impairment. (Tr. 207-09, 232-38, 245-46, 417, 439.) Although plaintiff does not further specify her learning disability, the Diagnostic and Statistical Manual of Mental Disorders identifies as learning disorders reading disorder, mathematics disorder, and disorder of written expression, consistent with plaintiff's allegations of difficulty reading, writing, and counting money. DSM-IV at 49. However, the ALJ indicated that plaintiff can add and subtract and write personal information. (Tr. 151-54.) He also relied on indications that plaintiff could make purchases independently, operate a computer, and keep a journal. (Id.) Moreover, the record indicates that plaintiff performed substantial duties in school for a student-run enterprise, including maintaining the delivery schedule, using office machinery, word processing equipment, and learning the accounting aspect of the student-run business. (Tr. 124.) Substantial evidence, therefore, supports the ALJ's conclusion that plaintiff's learning disability is not severe.


C. **Combined effect of impairments**

Plaintiff further argues that the ALJ should have considered the combined effect of all of her impairments, irrespective of whether any individual impairment could be considered sufficiently severe. See 20 C.F.R. § 416.923. The Commissioner has a duty to consider plaintiff's additional impairments in the aggregate. Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000). However, the ALJ's decision should not be overturned as long as its overall conclusion is supported by the record. Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011). Here, the ALJ considered each of plaintiff's impairments individually and found none of them, aside from mild mental retardation, affected her ability to perform work. (Tr. 267-70). The ALJ based his decision on a thorough examination of the record. Plaintiff makes no argument and points to no evidence indicating that consideration of the impairments in the aggregate would

have resulted in a different decision.  Thus, substantial evidence supports the ALJ's determination that plaintiff suffered no additional severe impairment.

Plaintiff argues that the ALJ failed to recognize that plaintiff could not function in a job setting outside the supportive setting of her school, citing Listing 12.00F, which discusses the relevance of the effect of structured settings to the listings pertaining to organic mental disorders, schizophrenia, affective disorders, and anxiety-related disorders.  20 C.F.R. Pt. 404, Subpt. P., App. 1.  However, the record indicates that plaintiff quit her job at school, "because [she] didn't want to work anymore."  (Tr. 35.)  Plaintiff argues that that her only job was within the supported employment program from her high school.  However, plaintiff also worked laundering at the YMCA.  (Tr. 98.)  Although she testified at the hearing that the YMCA fired her for failure to follow directions, but she originally indicated that she left the job because the YMCA hired her only for the summer.  (Tr. 98, 287.)  Accordingly, the ALJ did not err by failing to recognize that plaintiff could not function in a job setting outside of school.


## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on March 25, 2014.